In re THE COURIER–JOURNAL and Louisville Times Company, Petitioners,

v.

Robert MARSHALL and Martha Marshall, Respondents.

No. 86–5741.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1987.

Decided Aug. 26, 1987.

See also, 6th Cir., 828 F.2d 355.

Jon L. Fleischaker (argued), Kimberly K. Greene, William H. Hollander, Wyatt, Tarrant and Combs, Louisville, Ky., for petitioners.

J. Richard Cohen, Morris S. Dees, Jr., Montgomery, Ala., Alexander R. Sussman (argued), New York City, for respondents.

Before LIVELY, Chief Judge, RYAN, Circuit Judge, and PORTER, Senior District Judge.*

RYAN, Circuit Judge.

Petitioner Courier-Journal and Louisville Times Company seeks a writ of mandamus to compel the district court to vacate protective orders effectively limiting public and media access to specified fruits of discovery[1] in the Marshalls' civil rights lawsuit against persons who destroyed their home. We conclude that the protective orders were proper and that the writ should not issue.

## I.

The Marshalls are a black couple whose home was twice firebombed after they moved into the exclusively white community of Sylvania, in Jefferson County, Kentucky. Ku Klux Klan activity temporally and physically proximate to the two incidents led the Marshalls to list unnamed Ku Klux Klan members as defendants in the complaint they filed, under 42 U.S.C. §§ 1985(3) & 1986 (1981), against those who conspired to firebomb their home.

Shortly after the first arson, the local media revealed that nonparty appellant Young, then a Jefferson County police officer, was a Ku Klux Klan member. The Marshalls sought to depose him in connection with their suit. Because Young admitted to being a Klan official, rather than a common Klansman, the Marshalls sought from him a list of members of Young's local Klan group. A subpoena duces tecum was issued requiring Young to bring with him to the deposition hearing any such membership lists he might have.

Young moved to quash the subpoena, or in the alternative for a protective order preventing disclosure of information revealed in his deposition, contending that disclosure would lead to economic and so-cial retribution against those whose Klan affiliation would thereby be made public. The court eventually ordered Young to comply with the subpoena and reveal the information requested, but ordered that only the law firms involved in the suit could have access to the deposition's contents.

Young then gave his deposition, but he refused to bring along the membership list, as ordered, citing his first amendment right of association. Young admitted to having a post office box in the name of the Confederate Officers Patriot Squad (COPS) that he used to receive Ku Klux Klan mailings and correspondence, but insisted that COPS was never an organization. He admitted to the existence of a list of Klan members to which he had access, which contained roughly forty names, and stated that "probably more than half" of the persons named were law enforcement officers. He named a few names, but claimed to know nothing first-hand about the firebombings.

The protective order turned out to be ineffectual, because language in it permitted use of Young's deposition "to pursue and/or defend this civil litigation." The Marshalls used information from the deposition in their court pleadings. The local media immediately obtained access to the pleadings, and accounts summarizing this information appeared in the local newspapers and on radio and television. The key information as thus transmitted was that Young headed a Klan-affiliate with forty members called COPS, over half of whom were local law enforcement officers.

The Marshalls continued to seek, and Young to resist production of, the membership list. Eventually, Young was cited for contempt.[2]

The petitioner here, the Courier-Journal and Louisville Times Company (the publish-

---

* The Honorable David S. Porter, Senior Judge of the United States District Court for the Southern District of Ohio, sitting by designation.

1. The propriety of the underlying discovery order mentioned in this case, as well as the protective order dealt with here directly, are also addressed in the companion case of *Marshall v. Bramer,* 828 F.2d 355 (6th Cir.1987).

2. Young's appeal of this contempt order is dealt with in the companion case. *See* note 1 *supra.*

er) is a news organization that has been covering the Marshalls' case. The publisher brought a motion to vacate the protective order as violative of the press first amendment right of access to judicial proceedings, especially proceedings of intense public concern. This motion was denied.

Later, in the hope of resolving the discovery dispute, the district court entered a second and more stringent protective order, addressed solely to the problem of preserving the presumptive privacy and associational rights of those whose names were on the membership list. This second protective order stated in part:

> Deponent Alex Young is being ordered to deliver to plaintiffs' counsel the names and addresses of his Klan unit under seal. To prevent the possibility of anyone learning the contents of the membership list, no copy of the list will be filed with the Clerk of the Court. The plaintiffs and their counsel are directed not to file with the Clerk of the Court any deposition taken of any past or present Klan members included on said list, or any document that contains the names or addresses of persons on said list.

The publisher then sought a writ of mandamus to compel the district court to vacate both of the protective orders.

## II.

■ We have jurisdiction to review these protective orders because the publisher's first amendment rights were arguably "impaired and curtailed by the order[s]," and the publisher:

> being neither a party to the litigation nor specifically enjoined by the order[s] from discussing the case ... was not in a position to seek a remedy by direct appeal to this Court.

*CBS, Inc. v. Young*, 522 F.2d 234, 237 (6th Cir.1975). The scope of review called for by a mandamus petition, however, is quite narrow:

> The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations. *Will v. United States*, 389 U.S. 90, 95, 19 L.Ed.2d 305, 88 S.Ct. 269 [273] (1967); *Bankers Life & Cas. Co. v.*

*Holland,* 346 U.S. 379, 382–385, 98 L.Ed. 106, 74 S.Ct. 145 [147–149] (1953); *Ex parte Fahey,* 332 U.S. 258, 259, 91 L.Ed. 2041, 67 S.Ct. 1558 [1559] (1947). As we have observed, the writ "has traditionally been used in the federal courts only 'to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so,'" *Will v. United States,* supra, at 95, 19 L.Ed.2d 305, 88 S.Ct. 269 quoting *Roche v. Evaporated Milk Assn.,* 319 U.S. 21, 26, 87 L.Ed. 1185, 63 S.Ct. 938 [941–942] (1943). And, while we have not limited the use of mandamus by an unduly narrow and technical understanding of what constitutes a matter of "jurisdiction," *Will v. United States,* supra, at 95, 19 L.Ed.2d 305, 88 S.Ct. 269, the fact still remains that "only exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy." Ibid.

*Kerr v. United States District Court,* 426 U.S. 394, 402, 96 S.Ct. 2119, 2123–24, 48 L.Ed.2d 725 (1976).

## III.

In *CBS, Inc. v. Young,* 522 F.2d 234 (6th Cir.1975), we granted a petition for a writ of mandamus at the instance of a nonparty media petitioner. *CBS* involved a comprehensive order prohibiting "all parties concerned" from "discussing in any manner whatsoever" the consolidated personal injury and wrongful death actions brought by and on behalf of students killed and injured by the Ohio National Guard at Kent State University on May 4, 1970. *Id.* at 236. We note at the outset that, in *CBS,* the district court sought to restrain all reporting about a trial, whereas here the district court has restricted access only to one specified product of discovery. The protective order in this case does not purport to limit access to trial proceedings or to restrain publication of any information that may be revealed at trial.

The Supreme Court has directly addressed the constitutionality of orders limiting access to the fruits of discovery in

*Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). Like this case, *Seattle Times* was a civil case in which the trial court entered an order compelling discovery and also prohibiting any public use of the information thereby obtained. The privilege asserted in *Seattle Times* was also grounded in the first amendment, although there the privilege was asserted by the plaintiff in a defamation suit, a religious leader who claimed the discovery sought would infringe upon his rights of privacy and religious freedom. The Supreme Court observed that "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny," 467 U.S. at 33, 104 S.Ct. at 2208, because "such a protective order prevents a party from disseminating only that information obtained through use of the discovery process." *Id.* at 34, 104 S.Ct. 2208. Pretrial discovery, the Court stated, is traditionally subject to the control and discretion of the trial judge, and ordinarily proceeds as a private interchange between the parties, the fruits of which are not presumptively public. Accordingly, any judicial review of protective orders entered in the discovery context must take into account "the unique position that such orders occupy in relation to the First Amendment." *Id.* Concluding that "[t]he unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders," *id.* at 36, 104 S.Ct. at 2209, the *Seattle Times* Court held:

> [W]here, as in this case, a protective order is entered on a showing of good cause, ... is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment.

*Id.* at 37, 104 S.Ct. at 2209–10.

■ As we have already stated, the protective orders in this case limit access only to specified fruits of discovery. They do not mention the press at all, and thus do not restrain the press from publishing any information it may obtain through its own initiative. Consequently, our inquiry here is limited to the question of whether the protective orders entered were premised upon a "showing of good cause," and the standard of review is whether the trial court abused its discretion.

The district court's "showing of good cause" consisted of a balancing of the Marshalls' right to pursue discovery, under Fed.R.Civ.P. 26(b)(1), of "any matter, not privileged, which is relevant to the subject matter involved in the pending action," against Young's assertion of a first amendment privilege, founded in freedom of association. In *Seattle Times,* the Court set forth the following balancing test:

> [I]t is necessary to consider whether the "practice in question [furthers] an important or substantial governmental interest unrelated to the suppression of expression" and whether "the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez,* 416 U.S. 396, 413, 40 L.Ed.2d 224, 94 S.Ct. 1800 [1811], 71 Ohio Op.2d 139 (1974); see *Brown v. Glines,* 444 U.S. 348, 354–355, 62 L.Ed.2d 540, 100 S.Ct. 594 [599–600] (1980); *Buckley v. Valeo,* 424 U.S. 1, 25, 46 L.Ed.2d 659, 96 S.Ct. 612 [637–638] (1976).

467 U.S. at 32, 104 S.Ct. at 2207. The "practice" here is that of sealing deposition testimony; the "governmental interest" is that of permitting the Marshalls to seek to vindicate their rights by conducting discovery, while protecting individuals who may once have joined the Ku Klux Klan (but who have no discoverable connection with the Marshalls' case) from ostracism and retaliation based on past political associations; the first amendment freedom limited is that of the press to obtain and to publicize information of great public interest that is produced by the adjudicative process; and the question about the scope of the protective orders is whether they were "no greater than is necessary or essential" to permit the Marshalls to obtain the membership list without exposing the

affiliation of those whose names appear on it.

The publisher's central argument is that the district court's balancing was fatally flawed by its reliance upon the premise that members of the Ku Klux Klan have associational rights under the first amendment that could give rise to a right not to have their affiliation disclosed. The publisher insists that Klan members have no such right. The authority for this proposition is *Bryant v. Zimmerman*, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928), which upheld a state statute requiring organizations that require an oath as a condition of membership (such as the Ku Klux Klan) to file a roster of members with the state. The Supreme Court held that such a law does not violate due process rights of members of such groups because "requiring this information to be supplied for the public files will operate as a deterrent from the violations of public and private right to which the association might [otherwise] be tempted." *Id.* at 72, 49 S.Ct. at 65. The Court presumed that the state legislature passed the law with the particular depredations of the Ku Klux Klan in mind, and considered the control of such activities to be self-evidently a matter well within the state's police power.

The publisher's reliance upon *Bryant* is misplaced. *Bryant* reasons that a state may abridge the associational rights of Klan members because they belong to a group with lawless aims and a proven record of violence. In *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), however, the Supreme Court unanimously struck down a statute making it a crime to advocate violent political reform. The appellant had been convicted under the statute for a speech delivered at a Ku Klux Klan rally in Ohio. In arriving at its *Brandenburg* holding, the Court expressly overruled a case contemporaneous with *Bryant*, *Whitney v. California*, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927). In the Court's words, *Whitney* upheld a statute "on the ground that, without more, 'advocating' violent means to effect political and economic change involves such danger to the security of the State that the State may outlaw it." *Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829. In stating that *Whitney* had been "thoroughly discredited by later decisions," *id.*, the *Brandenburg* Court expressed an unambiguous rejection of the kind of reasoning which supported the *Bryant* result. *Bryant* was not expressly overruled, but one may not plausibly contend that *Brandenburg* did not at least severely limit *Bryant*.

The publisher nonetheless insists that the continued vitality of *Bryant* is shown by the fact that it was distinguished in *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). In this case, the Court held that Alabama could not force the NAACP to turn over its list of members because:

Alabama has fallen short of showing a controlling justification for the deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have.

*Id.* at 466, 78 S.Ct. at 1173–74. The Court considered *Bryant* distinguishable:

From what has already been said, we think it apparent that New York ex rel. *Bryant v. Zimmerman*, 278 U.S. 63, 73 L.Ed. 184, 49 S.Ct. 61, 62 A.L.R. 785, cannot be relied on in support of the State's position, for that case involved markedly different considerations in terms of the interest of the State in obtaining disclosure. There, this Court upheld as applied to a member of a local chapter of the Ku Klux Klan, a New York statute requiring any unincorporated association which demanded an oath as a condition to membership to file with state officials copies of its "... constitution, by-laws, rules, regulations and oath of membership, together with a roster of its membership and a list of its officers for the current year." N.Y. Laws 1923, ch. 664, §§ 53, 56. In its opinion, the Court took care to emphasize the nature of the organization which New York sought to regulate. The decision was based on the particular character of the Klan's activities, involving acts of unlawful intimidation and violence, which the

Court assumed was before the state legislature when it enacted the statute, and of which the Court itself took judicial notice.

*Id.* at 465, 78 S.Ct. at 1173. Evidently, the Court's decision to distinguish, rather than overrule, *Bryant* was founded on a belief that the facts of the two cases were simply not on all fours. Given that belief, the Court would not have been justified in reaching out to overrule *Bryant,* and we cannot construe *NAACP v. Alabama,* as persuasive evidence of *Bryant*'s continuing vitality. *Brandenburg,* moreover, postdates *NAACP v. Alabama,* and spoke more directly to the rationale behind *Bryant.*

Accordingly, we must firmly reject the publisher's assertion that there is no privilege to counterbalance against its own first amendment interest. Not only do the Klan members have associational rights, but the Marshalls have a right to seek to vindicate their civil rights without their individual concerns being sacrificed to a generalized desire of the press to publish and the public to know every fact disclosed by the discovery process as soon as the parties do.

■ The publisher's claim of a first amendment right of access to the fruits of discovery is equally unsound. The cases relied upon for this point uniformly predate *Seattle Times* or deal with public and press access to presumptively and historically open trial proceedings. For example, *Press Enterprise Co. v. Superior Court,* —— U.S. ——, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), dealt with the right of public access to traditionally public pretrial preliminary hearings, as conducted in California in *criminal* cases. The Court held that there is a qualified right of access to these proceedings, which can be overridden by specific findings by the trial court to the effect that higher interests demand closure of the hearing to the public. In contrast to its holding in *Press Enterprise,* the Court in *Seattle Times* held that:

pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, *Gannett Co. v.*

*DePasquale,* 443 U.S. 368, 389, 61 L.Ed.2d 608, 99 S.Ct. 2898 [2910] (1979), and, in general, they are conducted in private as a matter of modern practice. See id., at 396, 61 L.Ed.2d 608, 99 S.Ct. 2898 [at 2913–2914] (Burger, C.J., concurring); Marcus, Myth and Reality in Protective Order Litigation, 69 Cornell L.Rev. 1 (1983). Much of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related, to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information.

*Seattle Times,* 467 U.S. at 33, 104 S.Ct. at 2207–08. In recent cases, *Seattle Times* has been relied upon repeatedly to reject challenges to protective orders concerning the fruits of civil discovery. *See, e.g. Anderson v. Cryovac, Inc.,* 805 F.2d 1 (1st Cir.1986); *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108 (3d Cir.1986); *Oklahoma Hospital Ass'n. v. Oklahoma Publishing Co.,* 748 F.2d 1421 (10th Cir.1984), *cert. denied,* 105 S.Ct. 3528, 87 L.Ed.2d 652 (1985).

Furthermore, the protective orders entered here were much narrower than those entered in such cases as *Press Enterprise* and *CBS, Inc. v. Young,* 522 F.2d 234 (6th Cir.1975). The publisher insists that the scope of these orders is still much too broad, but the premise for this claim is the faulty one that Klan members have no rights. We consider these orders to be no more extensive than is absolutely necessary to preserve the anonymity of Klan members whose names appear on the membership list, but who are not discovered to have sufficient connection with the Marshalls' suit to become parties or witnesses.

The publisher insists that the "right to know" in this instance is peculiarly strong because there is a public issue raised by the revelation that some two dozen local law enforcement officers are Klan members. *Cf. Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1176–81 (6th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984). The

presence of Klansmen on the police force is, however, a marginal issue in the Marshalls' suit. The possibility that the Klan may have a substantial foothold in the local constabulary has never been subject to the evidentiary contest of a trial and has not formed the basis for any court ruling. The membership list, if produced, will not become part of any presumptively public record. Under *Seattle Times*, the right of access simply does not extend this far.

We conclude that the extraordinary circumstances that would permit us to grant a writ of mandamus are not present here. The district court's protective orders were "limited to the context of pretrial civil discovery," and they did not "restrict the dissemination of the information if gained from other sources." *Seattle Times*, 467 U.S. at 37, 104 S.Ct. at 2209–10. Furthermore, the orders were "entered on a showing of good cause," *id.*, after fairly balancing the very limited right of access the press has to the presumptively nonpublic fruits of civil discovery against the right of civil rights plaintiffs to obtain discovery of a Ku Klux Klan membership list over a claimed privilege based on first amendment associational rights. The central issue, as the district court recognized, is not the relatively slight right of public access in this context, but whether the protective order was an appropriate means of facilitating discovery while respecting the rights of nonparties whose past or present associations might thereby be revealed. The second protective order, which would apply to the membership list once produced, is narrowly drawn to achieve this goal, and the district court therefore acted well within its discretionary power to oversee the discovery process.

## IV.

The petition for a writ of mandamus is DENIED.

**LIVELY, Chief Judge, concurring.**

I concur in the judgment and in much of what Judge Ryan has written in the majority opinion. However, I disagree with the majority's treatment of *Bryant v. Zimmerman*, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928).

The protective orders in this case can be upheld and the petition for a writ of mandamus denied on the authority of *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), which speaks clearly on the central issue in this case. *Bryant v. Zimmerman* is easily distinguishable, since it involved an appeal from a holding that a state statute was unconstitutional. Appellate courts have infinitely broader discretion in reviewing such a holding than they do in considering an original action seeking the extraordinary remedy of mandamus. The Supreme Court has passed up several opportunities to overrule *Bryant v. Zimmerman*, and we should not attempt to eliminate it from the body of the law.

Although the holding of *Bryant v. Zimmerman* does not serve to upset the balance in favor of protective orders in civil pretrial discovery proceedings, I am not prepared to agree that there are no circumstances in which that holding would provide the proper rationale for an appellate decision.