828 F.2d 355
 56 USLW 2136, 8 Fed.R.Serv.3d 873, 23
Fed. R. Evid. Serv. 371
 Robert MARSHALL and Martha Marshall, Plaintiffs-Appellees,
v.
Carl Ray BRAMER, Billy Wayne Emmones, John Doe, and unknown
defendants K-1 through K-50, Ku Klux Klan members and others
who participated in the events set out in this complaint and
those whose names are unknown at this time, Defendants,
Alex Young, Nonparty-Appellant.
 No. 86-5633.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 5, 1987.
Decided Aug. 26, 1987.
 
 Mark L. Miller (argued), Miller and Meade, Louisville, Ky., Don C. Meade, for nonparty-appellant.
 Phillip J. Shepherd, Shepherd, Shepherd & Childers, Frankfort, Ky., Morris S. Dees, Jr., Montgomery, Ala., J. Richard Cohen, Alexander R. Sussman (argued), New York City, for plaintiffs-appellees.
 Samuel H. Fritschner, Louisville, Ky., for amicus curiae, American Civ. Liberties Union of Kentucky.
 Before LIVELY, Chief Judge; RYAN, Circuit Judge; and PORTER, Senior District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 This is an appeal by nonparty appellant Alex Young from civil contempt orders entered after he refused to produce a list of members of a Ku Klux Klan group, 110 F.R.D. 232. Plaintiffs Robert and Martha Marshall sought the list as a part of the discovery process in their civil rights case against those who twice firebombed their home.[1] We affirm the contempt orders.
 
 I.
 
 2
 Sylvania is a small community of seventy-five homes located near Louisville in Jefferson County, Kentucky. Blacks who have lived there in the past have been targets for harassment. No blacks were living there in 1985 until the Marshalls bought a house and attempted to move into it. After word was out in the community that a black family had bought a house in Sylvania, but before the Marshalls moved in, there was a Ku Klux Klan meeting in Jefferson County. At about this same time, Klan members posted some one hundred fifty "Join the Klan" signs and distributed hundreds of Klan leaflets in Sylvania.
 
 
 3
 The first night Mrs. Marshall spent in her new home she was alone with her two children. Around bedtime, she saw a pickup truck drive by and heard someone shout "nigger." Later, about 3:00 a.m., a firebomb was thrown into the house, causing a great deal of damage.
 
 
 4
 Defendants Bramer and Emmones pled guilty to the firebombing. It is not clear what connection, if any, these two have with the Klan, but Klan emblems were found in the Marshalls' front yard the morning after the attack.
 
 
 5
 The first arson occurred on July 29, 1985. The Marshalls filed a civil rights action under 42 U.S.C. Secs. 1985(3) & 1986 (1981) on August 22, 1985. On August 24, 1985, a Ku Klux Klan rally was scheduled to be held at the home of the brother-in-law of one of those who pled guilty to the first arson. This home was two blocks from the Marshalls' home. A few hours before the rally, the remains of the Marshalls' home were again firebombed. At the rally, which was attended by the Imperial Wizard of the Invisible Empire of the Ku Klux Klan, one speaker promised that no blacks would be permitted to live in Sylvania.
 
 
 6
 Appellant Young, at the time of the first arson, was a Jefferson County police officer. Soon after that first arson, a Louisville television station broadcast a story exposing him as a member of the Ku Klux Klan. Apparently in response, Young was transferred on August 1, 1985, from his job as a helicopter pilot to the police property room. After filing suit, the Marshalls noticed Young's deposition and served him with a subpoena duces tecum requiring him to bring a list of members of the Confederate Officers Patriot Squad (COPS) or the Ku Klux Klan. Young's efforts to quash the subpoena were unsuccessful, but a protective order was entered.[2]
 
 
 7
 Young was deposed on November 5, 1985. He said his involvement with the Ku Klux Klan had long been known and tolerated in the police department, and that he had been an officer in the Klan, but had resigned on July 23, 1985. He said the COPS was never an organization in its own right, but only a post office box where he received Klan correspondence and information. He admitted that he raised money for the Klan and kept it in a bank account under the COPS name. He admitted having attended the Klan meeting which preceded the first arson, but claimed that his only knowledge about the perpetration of that crime was a second-hand story to the effect that it was not racially motivated, but was done on a dare by some rowdy kids. Nonetheless, Young admitted to having contacted Hawkins, the police sergeant assigned to investigate the first arson, to assure him that there had been no Klan involvement in that crime.
 
 
 8
 Young's lawyer advised him not to produce the membership list or to reveal any of the names that were on it. Accordingly, Young admitted that he had access to a list of Klan members, possibly forty names and addresses, and that probably more than half of these were law enforcement officers, but he refused to produce the list itself.
 
 
 9
 After this deposition was taken and sealed, plaintiffs relied upon information in it to draft pleadings which they filed with the court. This limited use of information from the deposition was apparently permitted under the terms of the first protective order. The sensational news that a couple of dozen local police were in the Ku Klux Klan was soon reported in the local media. Young was then fired from the police force.
 
 
 10
 In March of 1986 Young was again ordered to produce the membership list, subject to a more stringent protective order. The second order was carefully designed to preserve the anonymity of nonparties whose names might appear on the membership list. When Young refused to produce the list, the court held him in contempt. This court stayed the $1,000 per day fine until Young's appeal of the production order could be resolved.
 
 II.
 
 11
 In order to help resolve the question of whether the Marshalls are entitled to discover Young's list of Jefferson County Ku Klux Klan members, the district court took judicial notice of:
 
 
 12
 findings and rulings contained in [five] cases in which the Ku Klux Klan is identified as a violence-prone group with a history of harassing, intimidating, and injuring blacks and members of other minority groups ... [and] of criminal cases in which individual Klan members were found or pleaded guilty to numerous crimes, many involving racial violence.
 
 
 13
 Federal Rule of Evidence 201, which treats judicial notice, "governs only judicial notice of adjudicative facts." Fed.R.Evid. 201(a). Adjudicative facts are facts about the parties or the issues to which the law is applied, usually by the jury, in the trial of a case. Discovery is plainly designed by the Federal Rules of Civil Procedure as a process distinct from the trial process. The scope of discovery is not limited to admissible evidence, but encompasses "any matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed.R.Civ.P. 26(b)(1). A discovery request is generally unobjectionable "if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Id.
 
 
 14
 In taking judicial notice of the nature of the Ku Klux Klan, the judge here was not finding the adjudicative facts of this case. He simply determined that it is reasonable of the plaintiffs to suppose that the Klan's membership list would help them discover who firebombed their home. If this same information about the nature of the Klan were judicially noticed at trial and employed as circumstantial evidence tending to prove, for example, the liability of a particular Klan member, then Rule 201 would apply. The rule does not apply here.
 
 
 15
 This is not to say that a trial court's recourse to judicial notice in passing on a discovery motion is unreviewable. Discovery is not made subject to the same evidence rules that would apply at trial, but Rule 201 does supply a well-accepted standard for judicial notice, and radical departure from this standard could amount to an abuse of the trial court's discretion in overseeing the discovery process. However, we perceive no such abuse of discretion here.
 
 Rule 201 provides in part:
 
 16
 A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
 
 
 17
 Fed.R.Evid. 201(b). The nature of the Ku Klux Klan, and its historic commitment to violence against blacks in particular, is generally known throughout this country and is not subject to reasonable dispute. Although it is generally not appropriate to judicially notice findings of fact made in other cases, the essence of the finding here, at least with respect to the criminal cases, is simply that Klan members have been convicted of crimes of racial violence. This is a legal conclusion, not a mere finding of fact, and the court records resorted to here may properly be viewed as "sources whose accuracy cannot reasonably be questioned."
 
 
 18
 Young objects not simply to the judicial notice, but to the inference the court drew, that, because the Klan has historically and nationally been violent, it is likely that a particular local Klan group has taken part in violent acts. This inference may well be impermissible if offered at trial to establish liability of a particular Klan member for a particular violent act, especially if the other evidence tending to connect that individual with the act were insubstantial. But here the inference has been drawn in the discovery process, and used in conjunction with specific facts already discovered tending to suggest a connection between the Klan and the acts of racial violence alleged in the complaint. The district court's use of judicial notice was unobjectionable.
 
 III.
 
 19
 Young contends that there is insufficient evidence of Ku Klux Klan involvement to justify an order requiring production of a list of Jefferson County Klan members. While there is no direct evidence connecting any particular known Klan member to the arsons, there is ample circumstantial evidence to justify the discovery order. This evidence includes:
 
 
 20
 1) Young's testimony that his involvement with the Klan was known and tolerated in the police department as long as it was not public knowledge;
 
 
 21
 2) Sylvania's proven history of racial "purity" obtained by hounding blacks out of the community;
 
 
 22
 3) Various broad hints that the police investigation into a possible Klan link to the first arson was less than zealous including, for example, Hawkins' admission that he knew "going in" that there was no Klan involvement, and Young's unsolicited call to Hawkins to inform him that the Klan was not involved;
 
 
 23
 4) The temporal and physical proximity of Klan meetings to the acts of arson;5) The promise at the August 24, 1985, meeting, just hours after the second arson, that the Klan would see to it that no blacks lived in Sylvania;
 
 
 24
 6) The Klan emblems found on the scene of the first arson;
 
 
 25
 7) The Klan activities of Young, including phone calls to Klan leaders temporally related to the two arsons; and
 
 
 26
 8) Young's disclosures about the size of the local Klan membership and its overlap with local law enforcement personnel.
 
 
 27
 The purpose of the broad scope of discovery is to permit parties to "obtain the fullest possible knowledge of the issues and facts before trial." Hickman v. Taylor, 329 U.S. 495, 501, 67 S.Ct. 385, 389, 91 L.Ed. 451 (1947). Even without reference to the judicially noticed facts, the evidence here was quite sufficient to justify the subpoena, subject to the court's protective order and the federal rules pertaining to discovery.
 
 IV.
 
 28
 In support of his refusal to comply with the subpoena duces tecum, appellant Young relies upon a series of cases which upheld the right of the NAACP to keep its membership lists secure from forced disclosure by government. Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). In these cases, the Court balanced the government's professed reasons for requiring the names of group members against the privacy and association rights of the group members and determined that the government's slim basis for seeking disclosure did not outweigh the rights of NAACP members.
 
 
 29
 Gibson states the balancing test the Court applied in these cases:
 
 
 30
 [I]t is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest. Absent such a relation between the NAACP and conduct in which the State may have a compelling regulatory concern, the Committee has not "demonstrated so cogent an interest in obtaining and making public" the membership information sought to be obtained as to "justify the substantial abridgment of associational freedom which such disclosures will effect."
 
 
 31
 372 U.S. at 546, 83 S.Ct. at 893-94 (quoting Bates v. City of Little Rock, 361 U.S. at 524, 80 S.Ct. at 417) (emphasis added). The Court's rationale was expressed in Bates:
 
 
 32
 Like freedom of speech and free press, the right of peaceable assembly was considered by the Framers of our Constitution to lie at the foundation of a government based upon the consent of an informed citizenry--a government dedicated to the establishment of justice and the preservation of liberty.... And it is now beyond dispute that freedom of association for the purpose of advancing ideas and airing grievances is protected by the Due Process Clause of the Fourteenth Amendment from invasion by the States.
 
 
 33
 * * *
 
 
 34
 Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference.... "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective ... restraint on freedom of association.... This Court has recognized the vital relationship between freedom to associate and privacy in one's associations.... Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."
 
 
 35
 361 U.S. at 522-23, 80 S.Ct. at 416 (quoting NAACP v. Alabama, 357 U.S. at 462, 78 S.Ct. at 1172) (citations omitted).
 
 
 36
 There are several significant points of distinction between the cited cases and appellant Young's. First, the NAACP cases were about government attempts at public disclosure of individual affiliation. Here, it is not a question of the government seeking to obtain and publicize a list of names, but of a private litigant seeking to view a list for the purpose of deposing individuals who may have relevant information about a pending case. Thus, there is not only a strong interest to justify "disclosure," but the disclosure itself, under the court's protective orders, is not to be public disclosure, but private disclosure for a limited use.
 
 
 37
 Young argues that merely turning over the list will destroy his rights and those of the Klan members on the list permanently and drastically. Young correctly insists that Klan members have first amendment rights,[3] and that exposure of their Klan affiliation could have a devastating impact upon some of them. Young already has lost his job. He correctly notes that the initial protective order, which was supposed to protect the contents of his deposition, was ineffective, and served, in practice, to permit key revelations to the press.
 
 
 38
 Young's claim would be compelling if this case involved public disclosure, as the NAACP cases did. In this case, however, the court's second protective order prohibits both the public filing of the list of members and the use of any of those names in a court pleading. Individuals named would presumably be deposed, but unless they were subsequently named as parties or called as witnesses, there would be no reason for any public disclosure of their affiliation. In the absence of evidence that the court's second protective order will be as ineffectual as the first, the risk of public disclosure is minimal, and the threat to first amendment rights is inconsequential.[4]
 
 
 39
 The discovery process is generally private; monitored at the request of the parties by district courts, who have "substantial latitude" in the exercise of their oversight. Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36, 104 S.Ct. 2199, 2209, 81 L.Ed.2d 17 (1984). The district court acted reasonably in recognizing the right of plaintiffs to conduct discovery and ordering that the Ku Klux Klan membership list be turned over. The court also acted reasonably to protect the right of Klan members to privacy in their associations by ordering that the anonymity of those whose names appear on the list be preserved. Because the court's discovery order adequately guarded the rights of those whose names would be revealed, Young's claim of privilege did not suffice to justify his refusal to comply with the subpoena.
 
 V.
 
 40
 We therefore AFFIRM the district court's orders finding Young in contempt for failure to comply with its subpoena.
 
 
 
 *
 The Honorable David S. Porter, Senior Judge for the United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 In the companion case, In re Courier-Journal and Louisville Times Co., 828 F.2d 361 (6th Cir.1987) we have rejected a publisher's challenge to protective orders preventing public access to the membership list after its production
 
 
 [2]
 The two protective orders entered in this case are discussed in the companion case. See note 1 supra
 
 
 [3]
 In the companion case, see note 1 supra, we set forth our reasons for rejecting the argument that Klan members have no associational rights. Briefly, our view is that Bryant v. Zimmerman, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928), which supports the view that Klan members have no associational rights, gained little force by being distinguished in NAACP v. Alabama, 357 U.S. 449, 465, 78 S.Ct. 1163, 1173, 2 L.Ed.2d 1488 (1958), and lost all force when Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), overruled Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927)
 
 
 [4]
 An amicus brief filed in this case by the American Civil Liberties Union proposes that we require a more stringent protective order, involving the coding of the list of names to insure anonymity and the submission by plaintiffs of a standardized set of interrogatories to all of these still-anonymous individuals. The ACLU also proposes that the normal scope of discovery must be narrowed here, because of the danger of infringing individual rights. These proposals would be useful if it had been shown that the discovery as ordered was an abuse of the trial court's discretion. In the absence of such a showing, the Court of Appeals will not redraft the discovery orders. We therefore decline to consider the merits of these proposals