**Paul KORDENBROCK, Appellant,**

v.

**COMMONWEALTH of
Kentucky, Appellee.**

Supreme Court of Kentucky.

Sept. 5, 1985.

Rehearing Denied Dec. 19, 1985.

Paul Isaacs, Public Advocate, Edward C. Monahan, Asst. Public Advocate, Timothy T. Riddell, Asst. Public Advocate, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., Penny R. Warren, Asst. Atty. Gen., Cicely D. Jaracz, Asst. Atty. Gen., Frankfort, for appellee.

STEPHENSON, Justice.

Paul Kordenbrock was convicted of first-degree robbery, KRS 515.020, attempted murder of William Thompson, KRS 506.010, and the murder of Stanley Allen, KRS 507.020(2) and KRS 532.025. He was sentenced to twenty years' imprisonment on the first-degree robbery conviction and a consecutive term of twenty years on the attempted murder conviction.

Kordenbrock was sentenced to death for the murder of Stanley Allen. He appeals this sentence. We affirm.

The crimes were committed in a Western Auto Store owned by William Thompson. Two days prior to the incident, Kordenbrock and a friend, Michael Kruse, entered the store, browsed around, and looked at wood-cutting tools. Thompson observed them and became suspicious of their actions. The next day Kordenbrock and Kruse again visited the store, looked at guns in a glass display case, and purchased a small hatchet. Kordenbrock asked Thompson to show one of the guns in the case. Thompson again became suspicious of their motives for visiting the store. Thompson was alone in the store on both visits.

On the day of the murder, Kordenbrock, armed with a pistol, and Kruse entered the store about 9:30 a.m. Pointing the gun, Kordenbrock ordered Thompson and his employee, Allen, to the rear of the store and ordered them to lie face down. Kordenbrock stood over them. A customer entered the store, and Kruse answered a query about repair of chain saws. The customer left. Thompson heard glass break in the store, then heard a shot, and felt a searing sensation on the back of his head. He then heard a second shot. Allen was dead from the gunshot wound. Thompson survived.

Kordenbrock and Kruse divided the stolen guns after leaving the store. About 10:00 a.m., they arrived at the residence of a friend, Gary Ramell. Kordenbrock sold Ramell two of the guns. Ramell testified Kordenbrock appeared mellow, and nothing seemed to be unusual.

Next, the pair arrived at the home of Richard Fehler. Kordenbrock sold Fehler two guns. Fehler testified that the pair seemed jittery and that Kordenbrock took Quaaludes.

The following day Kordenbrock drove to a cousin's house, and a Larry Hensley arrived and negotiated with Kordenbrock over the purchase of the guns.

In the meantime, Ramell had seen a news story about the murder and robbery. When Kordenbrock returned from his cousin's, Ramell questioned him about where the guns came from; he had noticed they were in a Western Auto box. Ramell, Fehler, and Hensley cooperated with the police and testified at the trial.

Hensley loaned the police his truck after he arranged to meet Kordenbrock to pay for the guns he had purchased. Kordenbrock was arrested at 10:10 p.m., and after interrogation, made a full confession.

Thompson testified at trial and identified Kordenbrock. Kordenbrock testified at trial and offered testimony that he was intoxicated and on drugs and did not intend to shoot or kill either of the men. After a finding of guilt, the same jury heard testimony in the penalty phase of the trial and recommended the death penalty.

It is in this setting that Kordenbrock argues twenty-nine assertions of error. Those assertions, which we do not address in this opinion, are nevertheless considered and rejected.

Kordenbrock asserts he was improperly sentenced to death without the assistance and testimony of a psychiatrist who had examined him.

This entire controversy centers on the Ohio psychiatrist who examined Kordenbrock, refusing to file a report until he was paid for the work accomplished to that point. The crimes occurred in January 1980; in April 1980, Kordenbrock requested funds to employ a psychiatrist. At a later hearing, the Commonwealth and the trial court agreed that the defense was entitled to a psychiatrist. It is interesting at this point to note that the agreement by

the Commonwealth was premised on the assumption there would be an insanity defense or defense of mental disease. The trial court, at a later hearing at which the Commonwealth was excluded, stated that he assumed this need for expert assistance was for the purpose of an insanity defense, and that he had no qualms about experts for diminished capacity or insanity. At the conclusion of the hearing, the trial court ordered funds be made available to employ a psychiatrist. Kordenbrock was examined by a psychiatrist, and we begin a series of continuances based on the controversy surrounding payment of the psychiatrist. The trial was finally commenced and concluded in July of 1981, after the trial court, on June 12, 1981, declined to grant further continuances.

It appears that defense counsel made an agreement with the psychiatrist that he would be paid in two stages. He had completed the examination and demanded payment before he filed his report. The trial court declined to order the fiscal court to pay the fees until the report was filed. The situation was aggravated by a public announcement that the fiscal court would not pay for the expert assistance. This impasse continued, and the case went to trial without the testimony of the psychiatrist.

KRS 31.200(1) provides that any direct expense incurred in representing an indigent "is a charge against the county on behalf of which the service is performed." The trial court had undoubted authority to order the fiscal court to pay the fees ordered. We are of the opinion, however, that the trial court acted prudently in declining to order payment until the report was filed. The proper procedure would have been for the report to be filed and then a proceeding to compel the fiscal court to pay according to the statute. Whether this statute is or is not fair is irrelevant. It is the legislature who determines this. We are of the opinion the trial court committed no error in this respect. If the entire matter were left here, it would provide a difficult problem, particularly if Kordenbrock

had raised a defense of insanity. However, there was no insanity defense or any pretense of a defense of mental disease or insanity. In a letter to a psychiatrist, Kordenbrock's lawyer stated he did not presently feel Kordenbrock was insane at the time of the offense.

■ From a perusal of the hearing and other statements, it appears that the underlying basis for psychiatric testimony was primarily for the penalty phase of the trial. The arguments made in Kordenbrock's brief exemplify this conclusion. His lawyers argue:

Without the assistance of a psychiatrist, defense counsel were unable to present expert testimony on (1) Paul's mental state at the time of his confession; (2) on whether Paul's actions in the Western Auto Store were less than intentional—whether they were wanton, did he act under extreme emotional disturbance; (3) the meaning of and effect on Paul of his motorcycle wreck, his military service, his relationship with his mother and father; (4) the explanation for his heavy use of drugs; (5) what effect Michael Kruse had on Paul; (6) whether Paul was a follower or leader; (7) whether he could be rehabilitated; (8) what factors mitigated Paul's acts.

KRS 31.110(1) provides that indigent defendants are entitled "to be provided with the *necessary* services and facilities of representation, including investigation and other preparation."

We are of the further opinion Kordenbrock was not entitled to funds for the employment of a psychiatrist to present expert testimony on the above eight subjects. This does not present a case of reasonably necessary expert testimony for the defense in this case. We do not have an *Ake v. Oklahoma,* —— U.S. ——, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), situation here. There, the defense was insanity; not so here. We do not believe a defendant in a case such as this has a right to a psychiatric fishing expedition at public expense, or an in-depth analysis on matters irrelevant to a legal defense to the crime.

Kordenbrock was offered a psychiatric test at a state facility. Upon being advised this facility would provide only an objective evaluation, Kordenbrock was sent to this facility but was advised by his lawyer not to communicate with the psychiatrist. The examining psychiatrist reported that Kordenbrock was calm, coherent, and exhibited no unusual activity suggestive of mental illness. We find *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), not applicable to this situation. *Lockett* struck down an Ohio statute for the reason the statute did not permit the consideration of mitigating factors other than the narrow factors authorized by the death penalty statute.

Kordenbrock requested a change of venue. A hearing was held, and the motion denied by the trial court. A hearing was held pursuant to KRS 452.210, which provides that the judge may order the trial to be held in an adjacent county "... if it appears that the defendant or the state cannot have a fair trial in the county where the prosecution is pending...." At the hearing, the trial court was presented with evidence by Kordenbrock about the amount of publicity and percentages of people in the county who knew of the crime, and who thought Kordenbrock was guilty, etc. The Commonwealth presented twenty-four affidavits that public opinion in the county was not such that Kordenbrock could not receive a fair trial.

■ We are of the opinion there is no showing that the finding of the trial court is clearly erroneous. It is not the amount of publicity which determines that venue should be changed; it is whether public opinion is so aroused as to preclude a fair trial. Here, eighteen months elapsed between the commission of the crime and the trial. Kordenbrock did not introduce any proof by affidavit or otherwise that public opinion was such that he could not receive a fair trial. This is the test. See *Garr v. Commonwealth,* Ky., 463 S.W.2d 109 (1971). The trial court has discretion in

this determination and will not lightly be disturbed.

A perusal of the voir dire which covers fifteen volumes of transcript discloses nothing more than knowledge of the case and some instances of opinion of guilt. This is not a case where prejudicial publicity pervaded the entire trial, such as *Shepard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

Kordenbrock asserts that a confession signed by him was involuntary. He now argues that his "will was overborne." The trial court conducted a suppression hearing and, at the conclusion of the hearing, denied the motion to suppress.

The interrogation leading to the confession began at about 11:30 p.m. and continued for two and one-half to three hours. The interrogation was transcribed and is forty pages in length. The two officers conducting the inquiry informed Kordenbrock that William Thompson was alive and would identify him and outlined the other evidence against him. He was told that the Cincinnati police would pick up the girls at the apartment where Kordenbrock had spent the prior night. One of these girls was picked up with Kordenbrock. He stated he had dated one of the other girls off and on for about three months. Most of the transcript consists of observations and questions by the officers. At page 6, when asked why he didn't take the money out of the cash register, he answered that he didn't know how to operate it. When asked why he went to the extent he did, Kordenbrock answered that something "snapped." On page 7, he stated he realized too late what was happening. On page 8, when asked about the gun he used, he stated it was in the river, under the suspension bridge. On page 9, he stated it was a thirty-eight. On page 11, he stated one guy started to get up when the customer came in. On page 24, he stated: "I did it," and answered "yes" to a question as to whether he pulled the trigger; "I just tried to shoot them so they wouldn't get up."

The officers had asked earlier why Kordenbrock didn't tell them what happened instead of pulling it out a little bit at a time.

At the suppression hearing, the officers testified that no threats were made and that the entire interrogation was conducted in a normal tone of voice.

Kordenbrock testified at the hearing. He stated that the transcript was accurate except for remarks by the officers accusing him of other robberies. He acknowledged that this accusation could have taken place while the tape was turned off. He testified that he signed the paper (confession) because he thought he was going to get a phone call and that he didn't want his friends hassled. He further stated that he signed for the reason that he thought something was going to happen to the girls or him, physically possibly.

There is nothing in the record to suggest physical harm was threatened or implied, and Kordenbrock does not state why he felt this way. He further does not state that his will was overcome or any of the badges of coercion in obtaining a confession.

▬ We are of the opinion the remarks by the police officers relative to the girl with Kordenbrock (who was being interrogated separately) or the other two girls were not of such a nature as to overcome his will and coerce the confession. Kordenbrock testified that he was "laid back" and "mellow" during the interrogation. He does not suggest what he now argues.

The same can be said of the assertion now that he attempted to stop the interrogation. At the suppression hearing, he did not so contend, and a perusal of the transcript of interrogation does not support this assertion.

Next, there is the argument that Kordenbrock was entitled to question the trial court as to his impartiality, etc. We will not comment on this absurd argument, other than to observe it is a waste of time for all concerned.

■ Finally, Kordenbrock asserts the Commonwealth was allowed to emphasize that the jury's sentence was only a recommendation. We have examined the record in this respect and are of the opinion this assertion of error has no merit. The word "recommend" was used, but not to such an extent as to denigrate the responsibility of the jury in imposing a death penalty. The voir dire went extensively into each juror's ability to *impose* the death penalty. We do not have a series of remarks such as occurred in *Ward v. Commonwealth*, Ky., 695 S.W.2d 404, decided May 23, 1985. A significant portion of the argument on this point is based on the remarks made by the Commonwealth's attorney at a bench conference, out of the hearing of the jury.

We have thoroughly examined the record and are of the opinion no reversible error was committed during the guilt or innocence phase of the trial.

We have further reviewed the penalty phase of the trial and the assertions of error made by Kordenbrock. We are of the further opinion that no reversible error was committed in the penalty phase of the trial. We do not comment on the arguments made in this respect for the reason that we consider these assertions to be without merit.

■ The one aspect of the case that stands out is the casual killing of a human being, not in anger or out of fear, or any other strong emotion, but just a casual murder.

We have conducted our review of the death sentence in accordance with the provisions of KRS 532.075. We are of the opinion from the record that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor and that the evidence supports the finding of an aggravating circumstance. KRS 532.025(2)(a).

■ We have considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases and have in this regard considered the crimes committed here and all of the evidence surrounding Kordenbrock and his background.

The data for our use in this regard have been compiled in accordance with KRS 532.075(6)(a), (b), and (c). We have considered all of the cases in which the death penalty was imposed after January 1, 1970. These cases are cited in *Harper v. Commonwealth*, Ky., 694 S.W.2d 665, decided May 2, 1985.

In making a comparative study of these cases and the circumstances in this case, we are of the opinion the sentence of death here is not excessive or disproportionate to the penalty imposed in the enumerated cases.

The judgment is affirmed.

STEPHENS, C.J., and AKER, GANT, STEPHENSON and WINTERSHEIMER, JJ., concur.

LEIBSON, J., dissents and files a separate dissenting opinion.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

This case should be reversed and remanded for a new trial for the following reasons:

1) *Failure to require payment of the defense psychiatrist.*

The Commonwealth had agreed before trial that the defense was entitled to employ a psychiatrist to investigate potential issues concerning the accused's mental state. The court had authorized the employment and ordered the county to pay the bill. Notwithstanding, the county authorities refused to accept responsibility for payment and thereafter the psychiatrist who had been employed, who was from Ohio and could not be subpoenaed, refused to participate further in appellant's defense.

There were a number of potential issues bearing on appellant's mental state at the time of the crime, relating to both the question of intentional murder and to the appropriate punishment, which supported

the appointment of a psychiatrist in the circumstances of this case. Certainly, the court was acting within its authority when it decided that the psychiatrist's services should be employed, and when it ordered the County to pay for such services. KRS 31.110(1); KRS 31.200(1).

In my judgment it was then incumbent upon the trial court to take necessary steps to enforce its order of payment against the County, and the failure to do so was reversible error. The recent case of *Ake v. Oklahoma*, —— U.S. ——, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) reenforces the accused's right to access to a psychiatrist's assistance at his trial when it is clear that his mental state at the time of the offense is a substantial factor in his defense. While perhaps *Ake* can be distinguished in certain respects, it applies in the circumstances of this case. Likewise, the right to present evidence in mitigation when charged with a capital offense made the appointment of a psychiatrist reasonable in the circumstances of this case. *See, Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

The issue here is not whether a psychiatrist should have been provided—that decision had already been made—but what should have been done when the County indicated it would refuse to pay a psychiatrist. The court's order should have been enforced against the county. Failing to do so was reversible error.

### 2) *The confession.*

The written confession introduced into evidence against the appellant was challenged on grounds that it was the product of coercion. *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). There were circumstances surrounding the taking of the confession which lend considerable support to this claim, although not necessarily compelling this conclusion. This includes the extended interrogation, evidence of psychological intimidation, and the accused's condition with reference to the taking of drugs.

Of equal or greater importance, in itself the written statement used against the accused suggests that on a number of occasions the appellant attempted to stop the questioning, as was his constitutional right, but his will was overridden. It is essential to have the tape recording to make this critical decision.

The record shows that clerical personnel in the police department erased the audio tape of this interrogation two or three days after the confession was procured, at the direction of the police officer in charge.

The tone of voice which would be evident from the audio tape, the pattern of interruption, and other non-verbal elements of this interrogation, have been destroyed. The tape recording of the conversation was the best evidence from which to decide the issues bearing on its admissibility. It has been disposed of so that the trial judge could not fairly decide, and we cannot review, this important issue.

In the circumstances of this case, where the written confession indicates a number of significant points at which the tone of voice and the manner of questioning would be critical to deciding whether the confession should have been suppressed, neither the trial court nor this court should affirm the use of the confession when the tape has been destroyed. In *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the United States Supreme Court directs that a coerced confession shall not be used, "whether true or false," because the method used to obtain it "offends constitutional principles." 404 U.S. at 485, 92 S.Ct. at 624. Faced with the shocking circumstances of the present offense, enforcing this constitutional principle places a disagreeable duty and an onerous responsibility on the court called upon to do so, but nevertheless a duty to be performed however disagreeable.

In *Hendley v. Commonwealth*, Ky., 573 S.W.2d 662 (1978), in similar circumstances we state:

"The interrogation of appellant was subject to proper inquiry and the tapes on which the questions and answers were

recorded were likewise the proper subject of inquiry. This court cannot overemphasize the importance of not only retaining such evidence, but of promptly making it available to counsel for the accused when requested and if it is in existence." 573 S.W.2d at 667.

In *Hendley*, there was nothing to indicate that the missing tape made a difference. Where, as here, the written transcription used as evidence raises serious questions about the manner of questioning, questions which could only be answered properly by listening to the tape, preserving the tape becomes crucial to the use of the confession. Without it, the written statement should have been suppressed.[1]

3) *Improperly suggesting to the jury that in imposing the death sentence it makes only a recommendation.*

*Caldwell v. Mississippi*, —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), removes any lingering doubt about the impropriety of referring to the responsibility of the jury in imposing a death sentence as only a recommendation.

In Kentucky, the jury's decision is more than a recommendation because it is critical to whether the death penalty can be imposed. The trial court cannot impose a death sentence unless the jury first decides that it is proper.

But without regard to whether this set of circumstances should or should not be termed a "recommendation," we are bound by the United States Supreme Court decision in *Caldwell v. Mississippi, supra,* where, in circumstances substantially identical to ours, the court stated:

"[W]e conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appro-

priateness of the defendant's death rests elsewhere....

... Belief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an 'awesome responsibility' has allowed this Court to view sentencer discretion as consistent with—and indeed as indispensable to—the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" —— U.S. at ——, 105 S.Ct. at 2639–40, 86 L.Ed.2d at 239–40.

The importance of *Caldwell v. Mississippi* is that it makes clear that what is critical is telling the jury that its sentence is only a recommendation, without regard to the argument over the word "recommendation" as technically correct.

Whereas, perhaps, it may still be arguable that where the term has not been used so extensively as to be pervasive, it is not reversible error, no such argument can be made in the present case. Over objection, each of the twelve jurors who decided appellant's fate were qualified with the express understanding that their sentencing function was only to recommend a sentence to the trial judge. The jury was told in opening statement that its duty was to "recommend" to the trial judge a sentence to "fit the crime of this case," and in the prosecutor's closing argument the sentence function was relegated to the level of "recommendation" on five different occasions. There was a repeated and then a continuing objection to the Commonwealth's reference to the jury's sentencing function as on a recommendation.

It is probably true that the emphasis on the jury's sentence as only a recommendation exceeded the bounds of propriety as discussed by this court in *Ice v. Commonwealth*, Ky., 667 S.W.2d 671 (1984). But we need not decide, because beyond ques-

---

1. It is noteworthy that appellant's contention that his confession was involuntary was based in part on his claim that he was under the influence of drugs at the time his statement was taken. When arrested he had in his possession a bottle of pills, the contents of which bore directly on this question, which was never analyzed because, once again, the police had misplaced the evidence.

tion the use of the term recommendation in this case exceeded the limitations in *Caldwell v. Mississippi, supra.*

For the reasons stated, this case should be reversed and remanded to be tried properly.