ROMAN CATHOLIC DIOCESE OF
LEXINGTON, Appellant,

v.

Mary NOBLE, Judge, Fayette
Circuit Court, Appellee.

and

The Lexington Herald–Leader Co., Inc.;
and Cape Publications, Inc., d/b/a the
Courier–Journal, Real Parties in In-
terest.

No. 2002–SC–0659–MR.

Supreme Court of Kentucky.

Nov. 21, 2002.

See also 92 S.W.3d 740.

John M. Famularo, Daniel E. Danford, Lexington, for Appellant.

Mary C. Noble, Lexington, for Appellee.

Robert F. Houlihan, Jr., Stoll, Keenon & Park, Lexington, for The Lexington Herald-Leader Co., Inc.

Jon L. Fleischaker, Kimberly K. Greene, R. Kenyon Meyer, Ashley Cleek Pack, Dinsmore & Shohl, LLP, Louisville, for Cape Publications, Inc. d/b/a The Courier-Journal.

Robert Treadway, Lexington, for Real Parties In Interest.

Opinion of the Court By Justice
JOHNSTONE.

Appellant, the Roman Catholic Diocese of Lexington, appeals as a matter of right from the denial of a petition for a writ of mandamus from the Court of Appeals. The petition sought to order Appellee, Judge Mary Noble, to enter an order sealing certain allegations that were struck from an amended complaint in the underlying case. We reverse and remand the case to the trial court for further proceedings because the Court of Appeals erroneously decided the question of whether sealing the allegations would be an abuse of discretion.

I. **Procedural History**

On May 30, 2002, a complaint was filed against the Roman Catholic Dioceses of Covington and Lexington ("Dioceses") alleging sexual abuse by Dioceses' priests and active concealment of that abuse by the Dioceses. In response to the complaint, the Dioceses, *inter alia*, filed a motion for a more definite statement. The trial court granted the motion and ordered the plaintiffs to file an amended complaint. The plaintiffs complied with the trial court's order and certain allegations raised in the amended complaint form the subject matter of this case.

Concurrent with filing the amended complaint, the plaintiffs filed a motion to seal the entire court record pursuant to KRS 413.249(3). This motion required the clerk of the court to seal the entire record until the trial court ruled on the motion to seal. The Dioceses responded to the amended complaint by moving to strike certain allegations contained in the amended pleading. Additionally, the Dioceses moved that any allegations struck from the amended complaint be permanently sealed independent of the plaintiffs' motion to seal the record under KRS 413.249. Before the trial court could rule on the motion to seal or the motion to strike, the Lexington Herald-Leader moved to intervene in order to contest the plaintiffs' motion to seal the record. In the motion to intervene, the Herald-Leader alleged, *inter alia*, that KRS 413.249 was unconstitutional.

On July 23, 2002, the trial court granted the Dioceses' motion to strike certain allegations from the amended complaint and ordered the plaintiffs to file a Second Amended Complaint that omitted paragraphs 27, 36, and 43 through 65 of the First Amended Complaint. But the trial court denied the Dioceses' separate motion to seal the stricken allegations.

The next day, July 24, in addition to granting the Herald-Leader's motion to intervene, the trial court denied the plain-

tiffs' motion to seal the record on grounds that KRS 413.249 was unconstitutional. As a direct consequence of this ruling, the trial court ordered the clerk of the court to "unseal the record, and make all contained therein not under other legal restriction available in an orderly manner to the public, including the media." The Lexington Diocese (Diocese)—but not the Covington Diocese—then petitioned the Court of Appeals for intermediate relief pursuant to CR 76.36(1) and (4), and for a writ of mandamus to order the trial court to seal the stricken allegations.

The same day, Judge Tackett, of the Court of Appeals, entered an order granting the Diocese emergency relief. The order stayed indefinitely enforcement of the trial court's order to unseal the entire record in the underlying case. The Court of Appeals denied the Diocese's petition for a writ of mandamus on August 9. Nonetheless, it stayed the enforcement of its own order for seven (7) days to permit the Diocese to seek intermediate relief in this Court. This stay was expressly limited to the allegations that the trial court ordered struck from the First Amended Complaint, but which the trial court refused to seal.

Seven days later, on August 16, the Diocese filed a notice of appeal and petitioned this Court for intermediate relief under CR 76.33. We granted intermediate relief and stayed the enforcement of the Court of Appeals' order denying the Diocese's petition for a writ of mandamus. On September 17, we heard arguments on the Diocese's matter of right appeal from the Court of Appeals' order denying its petition for a writ of mandamus. At oral argument, it became clear that the resolution of this case turns on the issue of whether the trial court was aware that it had discretionary authority to deny the Diocese's motion to seal. But before dis-cussing the issue, we first must determine whether we can reach it.

## II. Appropriateness of the Writ

 This case has a different posture than most cases concerning the sealing of documents. Usually the issue presented and litigated on appeal concerns an order by the trial court that *grants* a motion to deny access to court documents and records. *See, e.g., In re The Courier–Journal v. Marshall,* 828 F.2d 361 (6th Cir.1987). In a denial of access case, media representatives have the right to intervene and request a hearing on the trial court's order. *See Courier–Journal and Louisville Times Co. v. Peers,* Ky., 747 S.W.2d 125, 130 (1988). Once a media representative moves to intervene and requests a hearing, the representative may attack an adverse ruling by petitioning the Court of Appeals for a writ of mandamus or prohibition. *Id.* at 129. *Peers* held that the denial of access to court records and documents "represents exigent circumstances justifying coming directly to the appellate courts for an extraordinary remedy, *i.e.,* prohibition or mandamus." *Id.* But where there is no order denying access, there are no exigent circumstances to justify granting the writ. Rather, the party seeking the writ, the Diocese in this case, must satisfy the usual and strict requirements for justifying relief by prohibition or mandamus. We now turn to the question of whether the Diocese has shown that it is entitled to relief.

 A writ of mandamus is an extraordinary remedy. *University of Louisville v. Shake,* Ky., 5 S.W.3d 107, 110 (1999). As there is no allegation that the court below is acting without jurisdiction, before we can reach the merits of the Diocese's petition, the Diocese ordinarily must first establish that it has no adequate remedy by appeal *and* that it will suffer great and irreparable injury if the writ is

not granted. *Bender v. Eaton,* Ky., 343 S.W.2d 799, 801 (1961).

### No Adequate Remedy by Appeal

The alleged error in this case is the trial court's failure to seal the stricken allegations. Thus, the question to be asked is whether a favorable decision on appeal reversing this ruling would provide an adequate remedy for the harm or prejudice arising out of the alleged erroneous ruling. We conclude that it would not.

The harm that the trial court's ruling visits upon the Diocese is that access via court records to the stricken allegations creates an unfair connection between the allegations and the underlying case. As the trial court has already determined, those allegations are not only irrelevant, but they are, *inter alia,* impertinent and scandalous. Thus, the connection unnecessarily paints the Diocese in a bad public light. Consequently, there is a real possibility that the connection could endanger, to a degree, the Diocese's right to a fair trial. It is highly unlikely that this *present* threat of prejudice could be remedied at all in a *future* appeal. Thus, the Diocese has no adequate remedy by appeal. We now turn to the question of irreparable harm.

### Irreparable Harm

The Diocese argues that it will be irreparably harmed by the unsealing of the stricken allegations because the resulting publicity will prevent it from receiving a fair trial. This allegation does not rise to irreparable injury within the meaning of the rule. Injury that results in a "mere failure to succeed in [the underlying] litigation, followed by the loss of that which success might have brought [the petitioner]" does not establish great and irreparable harm within the meaning of requirements for granting a writ of mandamus or

prohibition. *Osborn v. Wolfford,* 239 Ky. 470, 39 S.W.2d 672, 673 (1931); *see also Bender,* 343 S.W.2d at 801 (citing *Osborn* with approval). But a showing of irreparable harm is not an absolute prerequisite to being entitled to relief in the form of a writ of mandamus or prohibition.

Thus we find that in certain special cases this Court will entertain a petition for prohibition in the absence of a showing of specific great and irreparable injury to the petitioner, provided a substantial miscarriage of justice will result if the lower court is proceeding erroneously, *and* correction of the error is necessary and appropriate in the interest of orderly judicial administration. It may be observed that in such a situation the court is recognizing that if it fails to act the administration of justice generally will suffer the great and irreparable injury.

*Bender,* 343 S.W.2d at 801 (emphasis in original).

Recently, we have used this exception to address the merits of alleged discovery violations because the alleged errors were unlikely to be brought on direct appeal *and* proper construction of the discovery rules in question was important to the orderly administration of justice. *See Wal–Mart Stores, Inc. v. Dickinson,* Ky., 29 S.W.3d 796, 801 (2000). The case at bar is similar to *Wal–Mart Stores* in that the issue of a trial court's power and authority to seal documents is seldom, if ever, an issue raised on direct appeal. Further, there is little Kentucky case law that addresses the extent of and the restraints on a trial court's power to deny access to court records and documents. Because these are important issues concerning the inherent authority of the trial courts of this Commonwealth, we conclude that we may reach the merits of the Diocese's petition under the exception to the normal

requirements for entertaining a writ for extraordinary relief, set forth in *Bender* and *Wal–Mart Stores.*

## III. The Right to Control Access

██ It is beyond question that a court has inherent, "supervisory power over its own records and files." *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570, 580 (1978). This inherent power gives a trial court discretionary authority to deny access to its records and files. The critical issue in this case is whether the trial court was aware that it had this discretionary authority.

Not surprisingly, the parties disagree sharply on this issue. On one side, the Diocese argues that the trial court wanted to seal the documents but simply could not find the authority to do so. According to the Diocese, the trial court focused solely on statutory authority and overlooked or failed to recognize its common-law authority to control access to its records and documents. On the other side, the appellee newspapers maintain that (1) the trial court was fully aware that it had the discretion to seal the stricken allegations, and (2) the trial court's order to deny the motion to seal the stricken allegations was the result of the proper exercise of the trial court's discretion.

While both positions are supported by statements made by the trial court, we conclude that the deciding factor to this disagreement is the trial court's Opinion and Order of July 23, which states in pertinent part:

> There is no authority for sealing or removing pleadings or portions thereof that have been stricken. CR 12.06 merely states that on sufficient grounds the Court may order portions of a pleading be stricken. [The rule] does not say

what "stricken" means, or how it is physically done.

> The Court has done a thorough, but not exhaustive, search for authority and could find none on point. In the Court's experience, the most common approach is to leave the document containing the stricken portions in the *record,* but to give them no *legal* effect. The remainder of a case flows from the amended documents. This process preserves the ability of a party aggrieved by the Court's ruling[,] to appeal on documents preserved officially in the record. It also meets the public interest of keeping all rulings by the Court open to scrutiny.

> However, such openness does serve to publicize allegations that the Court has ruled should never have been in the pleadings ab initio. The only protection for that is the legal finding by the Court that such allegations are improper as being sham, redundant, immaterial, impertinent, or scandalous.

*Graywolf, et al. v. Roman Catholic Dioceses of Covington, et al.,* 02–CI–2231 at 2 (Lexington Cir. Ct. Order entered July 23, 2002) (emphasis in original).

██ This language tips the scales in the Diocese's favor and brings us to the conclusion that the trial court was not aware that it had the discretion to seal the stricken material. It is at this point that we disagree with the decision of the Court of Appeals. The Court of Appeals sidestepped the issue of whether the trial court was aware it had the discretion to seal the stricken allegations by holding that it would have been an abuse of discretion for the trial court to have sealed the stricken material. However, the Court of Appeals should not have made a hypothetical decision concerning how it would have decided this case had the trial court exercised its discretion to seal the stricken allegations. A discretionary decision

whether to deny access to court documents and records should be made by the court in which those records and documents reside and not by an appellate court. *United States v. Amodeo*, 44 F.3d 141, 147 (2nd Cir.1995) (*Amodeo I*), citing *Nixon*, 435 U.S. at 599, 98 S.Ct. at 1313, 55 L.Ed.2d. at 580; *cf. Peers*, 747 S.W.2d at 130 ("If the Courier–Journal makes an appropriate motion to intervene and requests a hearing, the trial judge shall conduct a hearing consistent with this Opinion to decide whether all or portions of the record in the underlying case ... shall be made available for inspection by the news media.") Because (1) the determination of whether to deny access depends on the unique facts and circumstances of each case, and (2) the question of access relates to the trial court's own records, we hold that the Court of Appeals erred in reaching and deciding the issue of whether denying access to the stricken allegations would have been an abuse of discretion. Since the trial court, unaware that it had the authority to do so, failed to exercise its discretion in its ruling on the Dioceses' motion to seal the stricken allegations, the Court of Appeals should have remanded the case for the trial court to make the initial determination of whether to seal the stricken material.

Therefore, we correct the Court of Appeals' error and remand this case to the trial court to reconsider the Dioceses' motion to seal the stricken allegations. But we do so with the following discussion to guide the trial court's decision.

## IV. Common–Law Constraints

 Because monitoring courts is an essential feature of democratic control and judicial accountability, a trial court's right to control access to its records and documents is constrained by a general, common-law right to "inspect and copy public records and documents, including judicial records and documents." *Nixon*, 435 U.S. at 597, 98 S.Ct. at 1312, 55 L.Ed.2d. at 579; *Peers*, 747 S.W.2d at 129. Under this common-law right "judicial documents are presumptively available to the public, but may be sealed if the right to access is outweighed by the interests favoring non-disclosure." *United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997), *cert. denied sub nom Dallas Morning News v. U.S.*, 522 U.S. 1142, 118 S.Ct. 1110, 140 L.Ed.2d 163 (1998), citing *Nixon*, 435 U.S. at 602, 98 S.Ct. at 1314, 55 L.Ed.2d. at 582. The balancing test between a court's inherent right to control access and the public's presumptive right of access is "left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon*, 435 U.S. at 599, 98 S.Ct. at 1312–13, 55 L.Ed.2d. at 580.

*Nixon* is silent as to the weight to be given to the common-law right to access when striking this balance. Further, there is no uniformity among the federal courts that have addressed the issue. *Compare In re Application of National Broadcasting Co. (United States v. Myers)*, 635 F.2d 945 (2d Cir.1980) (the presumption is "especially strong" and denying access can only be justified when there are "extraordinary circumstances"), with *Belo Broadcasting Corp. v. Clark (United States v. Clayton)*, 654 F.2d 423, 434 (5th Cir.1981) (a trial court may deny access for "good reason"). In search of a workable standard that will assist trial courts in defining the weight to give the presumption of access, we turn to a thoughtful and well-reasoned opinion that explores this very issue, *United States v. Amodeo*, 71 F.3d 1044, 1048 (2nd Cir.1995) (*Amodeo II*).

According to the *Amodeo II* Court, the difficulty in making this determination

"flows from the purpose underlying the presumption and the broad variety of documents" to which the right of access attaches. *Id.* In explaining this statement, the *Amodeo II* Court began by discussing the reasons behind the presumption to access.

Access provides the means through which the citizenry monitor the courts. And monitoring provides judges with critical views of their work. *Id.* It casts the disinfectant of sunshine brightly on the courts, and thereby acts as a check on arbitrary judicial behavior and diminishes the possibilities for injustice, incompetence, perjury, and fraud. *Id.,* quoting *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.,* 998 F.2d 157, 161 (3rd Cir. 1993). "Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness." *Id.*

Not meaning to lessen the importance of the presumption of access, the *Amodeo II* Court nonetheless recognized that

an abundance of statements and documents generated in ... litigation actually have little or no bearing on the exercise of ... judicial power. The relevance or reliability of a statement or document generally cannot be determined until heard or read by counsel, and, if necessary, by the court or other judicial officer. As a result, the temptation to leave *no stone unturned* in the search for evidence material to a judicial proceeding turns up a vast amount of not only irrelevant but also unreliable material.

Unlimited access to every item turned up in the course of litigation would be unthinkable. Reputations would be impaired, personal relationships ruined, and businesses destroyed on the basis of

misleading or downright false information.

*Id.*

 In light of these practical, real-world considerations and concerns, the *Amodeo II* Court struck an appropriate and workable balance between these competing concerns by holding "that the weight given to the presumption of access must be governed by the role of the material at issue in the exercise of ... judicial power and the resultant value of such information to those monitoring the ... courts." *Id.* at 1048–49. Under this sliding-scale approach, documents and records that play an important role in determining the litigants' substantive rights are accorded the greatest weight. *Id.* at 1049. "[O]nly the most compelling reasons can justify" denying access to documents and records that are accorded great presumptive weight. *United States v. Beckham,* 789 F.2d 401, 413 (6th Cir.1986). On the other hand, documents and records that play only a minor or negligible role in adjudicating the rights of the litigants are afforded little weight and the right-of-access presumption amounts to little more than a "prediction of public access absent a countervailing reason." *Amodeo II,* 71 F.3d at 1049. The presumptive weight to give to the right of access for documents and records that fall in between these two extremes must be determined through the exercise of judgment and discretion. *Id.*

We believe that the sliding scale of *Amodeo II* represents the best approach in determining the weight to give to the presumption of access. Because the decision of whether to deny access should first be made at the trial level, *see discussion supra,* we leave it to the trial court to determine on remand where on this scale the stricken allegations at issue fall.

## V. First Amendment Constraints

In addition to the common-law public right of access, a number of courts have held that there is also a qualified First Amendment right of access to court records and documents. *McVeigh*, 119 F.3d at 811(citing cases). The holdings in these cases are extensions of the holdings and reasoning set forth in *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 7–9, 106 S.Ct. 2735, 2739–41, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*) (recognizing a First Amendment right of access to preliminary hearings as conducted in California), and *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press–Enterprise I*) (recognizing a First Amendment right of access to voir dire proceedings). *Id.* In such cases, the presumption in favor of access can only be overcome "by an overriding interest based on findings that [denying access] is essential to preserve higher values and is narrowly tailored to serve that interest." *In re Providence Journal Co., Inc.*, 293 F.3d 1, 11 (1st Cir.2002). Constitutionally-based claims to access are reviewed *de novo*. *Id.* Because the appellee newspapers claim a First Amendment right to the stricken allegations, we review this claim below.

The determination of whether a particular document is entitled to a First Amendment right of access is made using a two-pronged inquiry that asks (1) whether the document is one which has been historically open to inspection by the press and public, and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *McVeigh*, 119 F.3d at 811, *quoting Press–Enterprise II*, 478 U.S. at 8, 106 S.Ct. at 2740, 92 L.Ed.2d. at 10.

As to the first prong of the test, there is nothing to indicate that the public and the press historically have had access to sham, immaterial, impertinent, redundant or scandalous material that is without "legal effect." Further, allowing access to such material serves a negative rather than a positive role, as is exemplified by this case. The publication of the stricken allegations *via* press access to court files and records will create or reinforce a connection between the stricken, irrelevant, and scandalous allegations and the underlying case against the Diocese. This connection can only serve to improperly prejudice the populace in general, and potential jurors in particular, against the Diocese's case.

As to the second prong of the test, it is difficult to see how access to irrelevant and scandalous allegations that have no legal effect will substantially further the public's understanding of the judicial process. The trial court's finding that certain allegations fall within the grounds for striking portions of a pleading, and the trial court's description of the stricken allegations as sham, redundant, etc., is sufficient to understand why the trial court granted the motion to strike. Access to the allegations themselves would sensationalize, but not inform.

Therefore, assuming that such a right exists, no First Amendment right of access to the stricken allegations in question arises.

## VI. The Meaning of "Strike"

In response to the Dioceses' motion to remove the stricken material from the record, the trial court concluded that CR 12.06 provided no express authority to do so. Looking for implied authority, the trial court endeavored to determine the meaning of "stricken," and defined the word in terms of a process: "In the Court's experience, the most common approach is to leave the document containing the stricken portions in the *record*, but to give them no *legal* effect." The Court of

Appeals held that, in this context, the trial court correctly construed the meaning of the word "strike" or "stricken." We disagree.

The word "strike" means "to expunge, as from a record." *Blacks Law Dictionary*, 1436 (7th ed.1999). "Expunge" means "to erase or destroy." *Id.* at 603. Thus, under the plain meaning of the word, the power to "strike" material from the record is the power to remove the material from the record. The scant interpretation of the equivalent federal rule, FRCP 12(f), that we have been able to find is in accord with our interpretation of CR 12.06 and the word "strike." *See* Wright & Miller, *Federal Practice and Procedure: Civil 2d*, § 1380 (Under motion to strike pursuant to FRCP 12(f) "scandalous allegations and matters of this type often will be stricken from the pleadings in order to *purge the court's files* and protect the subject of the allegations.") (emphasis added); *see also United States v. Amodeo*, 71 F.3d 1044, 1048 (2nd Cir.1995) (stating in dicta that a federal district court may control access to its records by striking a pleading as scurrilous).

■ Therefore, we hold that the power to "strike" material from a court's record embraces the power to physically remove the stricken material from that court's record.

## VII. Mootness

■ Finally, we address the argument that this case was rendered moot when the stricken allegations were published on the front page of the August 24th edition of The Courier–Journal newspaper.

■ A trial court's order to seal documents and records does not affect the press's right to investigate and publish the information contained in the sealed documents when that information is indepen-

dently obtained through sources other than the court's records. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34, 104 S.Ct. 2199, 2208, 81 L.Ed.2d 17, 27 (1984). This remains true even when the press entity that publishes the information is a party to the lawsuit in which the documents were sealed. *Id.* Conversely, the press's right to publish does not affect a trial court's power to control its own records and documents.

■ It is true that publication of the material in question has diminished the force of the argument in favor of sealing the material, but it has not made that argument moot. Access to court records and documents is not denied solely to prevent publication and dissemination to the public. Access is also denied to keep the parties from using the court as a megaphone to amplify and give credence to scandalous and salacious allegations. Thus, a court may deny access to its records and documents to "insure that its records are not used to gratify private spite[,] promote public scandal" or to "serve as reservoirs of libelous statements for press consumption." *Nixon*, 435 U.S. at 598, 98 S.Ct. at 1312, 55 L.Ed.2d. at 580. Denying access for these reasons goes to the integrity of the particular court in question and to the judicial system as a whole. These concerns remain independent of any out-of-court publication or dissemination of material that remains sealed in a court's record.

Therefore, we hold that the issue raised on appeal is not moot.

## VIII. Conclusion

The trial court erred in concluding that it did not have the discretion to seal the stricken allegations in question or to physically remove the material from the record. The Court of Appeals erred in making an initial determination that sealing the

stricken allegations would have been an abuse of discretion. Therefore, we reverse the Court of Appeals and remand this case to the Fayette Circuit Court to reconsider—consistent with this opinion—the Dioceses' motion to seal the stricken allegations or to remove them from the record. Further, we order that the stricken allegations—including any repetition of those allegations in the Court of Appeals' record or in this Court's record—remain sealed until the Fayette Circuit Court rules. Finally, we hereby dissolve our order of August 26, 2002, granting the Diocese intermediate relief.

COOPER, GRAVES, and WINTERSHEIMER, JJ., concur.

LAMBERT, C.J.; KELLER and STUMBO, JJ., dissent by separate opinion.

Dissenting Opinion By Chief Justice LAMBERT, Justice KELLER, and Justice STUMBO.

## I. INTRODUCTION

We respectfully dissent from the majority opinion and would affirm the Court of Appeals decision denying the Roman Catholic Diocese of Lexington's ("Diocese's") petition for extraordinary relief. In our opinion, the terminal flaw in the majority opinion's analysis is its reliance upon an unsubstantiated assumption that the trial court's failure to seal the stricken portions of the First Amended Complaint "could endanger ... the Diocese's right to a fair trial."[1] Although the trial court conducted a hearing at which the Diocese could have introduced evidence to support its claim of prejudice,[2] the Diocese did nothing more than assert that the trial court's failure to seal the stricken portions of this record would prevent it from receiving a fair trial. In fact, the trial court *explicitly declined* to make the finding[3] upon which today's majority primarily relies, and in so doing, referenced case law holding that courts do not presume impairment of a litigant's entitlement to a fair trial whenever publicity surrounds litigation, because even "pervasive, adverse publicity does not inevitably lead to an unfair trial."[4] In fact, in case after case, courts have discovered that, despite widespread negative publicity, they can fill a jury box with fair and impartial jurors who have not formed an opinion as to the merits of the case.[5]

1. Majority Opinion at 92 S.W.3d 724, 729.

2. A review of cases in which criminal defendants have challenged venue because of concerns about negative pretrial publicity reveals that evidence in support of such a claim could come in the form of polling results and expert testimony, *see Jacobs v. Commonwealth*, Ky., 870 S.W.2d 412, 415 (1994), *McQueen v. Commonwealth*, Ky., 721 S.W.2d 694, 702 (1987), or from supporting affidavits and/or lay witnesses, *see Smith v. Commonwealth*, Ky., 473 S.W.2d 829, 831 (1971); *Harness v. Commonwealth*, Ky., 475 S.W.2d 485, 488 (1972).

3. Near the conclusion of the trial court's hearing on the Diocese's motion to strike portions of the First Amended Complaint and seal the record, the trial court stated: "I *would* probably [find that a failure to seal the record would interfere with her ability to conduct a fair and impartial trial], if that law hadn't been worn threadbare, and it doesn't hold water. There are too many cases out there that say that *the mere possibility* that releasing something to the press might make it difficult to get a jury ... is not sufficient." (emphasis added).

4. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683, 695 (1976).

5. *See Foster v. Commonwealth*, Ky., 827 S.W.2d 670, 675 (1992) (a much-publicized quintuple-murder case—from the same county as this underlying action—in which the trial court was able to seat an impartial jury despite the fact that "[a]ll potential jurors had heard or read about the case.").

Thus, regardless of whether the trial court properly recognized its inherent authority to seal its own records, the only argument[6] that the Diocese raised in the trial court in support of its motion to seal was considered by the trial court, and rejected, because the Diocese offered no evidence upon which the trial court could conclude that mere publication of the stricken allegations could "preclude a fair trial."[7] Accordingly, we find no basis for the majority's conclusions that: (1) this alleged risk to the Diocese's right to a fair trial satisfies the procedural requirements for the extraordinary relief requested; and (2) that we should "remand"[8] this matter to the trial court for it to exercise its discretion by balancing the common law right of access against other unspecified considerations.

## II. ANALYSIS

### A. REQUIREMENTS FOR EXTRAORDINARY RELIEF

Although we agree with the majority that the Diocese "must satisfy the usual and strict requirements for justifying relief by prohibition or mandamus,"[9] we disagree with the result reached by the majority because a proper application of those requirements leads (in our minds, inexorably) to the conclusion that we need not, and in fact cannot, reach the merits of the Diocese's petition. With regard to the requirement that the Diocese demonstrate

**6.** In its original action in the Court of Appeals, the Diocese raised, for the first time, the issue of whether access to the stricken allegations could impact the privacy interests of innocent third parties, and the Diocese repeats those arguments in its appeal to this Court. Of course, we do not permit advocates "to feed one can of worms to the trial judge and another to the appellate court." *Kennedy v. Commonwealth*, Ky., 544 S.W.2d 219, 222 (1977). And, thus, the Diocese's "appellate innovation" does not justify the issuance of a writ returning this matter to the trial court for the consideration of issues not originally presented to that court. In addition, the asserted privacy interest claims provide a poor rationale for restricting the right of access in this case for at least three clear reasons: (1) those claims not only lack uniqueness for the reasons conceded in the Majority Opinion's discussion of the mootness issue; (2) these private interests will also likely be inevitably disclosed during the presentation of evidence at trial if the trial court concludes that those allegations are probative of a "pattern or practice" of misconduct; and (3) the majority of these allegedly "private" interests involve material gleaned from *public* records.

**7.** *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384, 387 (1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986), *habeas granted, in part, on other grounds, Kor-*

*denbrock v. Scroggy*, 919 F.2d 1091 (6th Cir. 1990), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). See also *Montgomery v. Commonwealth*, Ky., 819 S.W.2d 713, 716 (1991).

**8.** While the majority's conclusion indicates that the relief it grants is to "reverse the Court of Appeals and remand this case to the Fayette Circuit Court to reconsider—consistent with this opinion—the Dioceses' motion to seal the stricken allegations," Majority Opinion, *supra* note 1 at 735, we do not believe that a remand of this case to the Fayette Circuit Court is procedurally possible. To "remand" is "[t]o send (a case or claim) *back* to the court or tribunal *from which it came* for some further action." BLACK'S LAW DICTIONARY 1296 (7th ed.1999) (emphasis added). As the action presently before the court—2002–SC–0659–MR—began as an original action in the Court of Appeals, we cannot "remand" that action to the Fayette Circuit Court because it has never been in that court. What this Court can do, and what we presume the majority intends to do, is remand this case to the Court of Appeals with instructions for it to grant a writ of mandamus directing the trial court to reconsider the motion to seal. In the interests of consistency, however, we will use the majority's "remand" language in this dissenting opinion.

**9.** Majority Opinion, *supra* note 1 at 728.

that it has no adequate remedy by appeal, the majority: (1) erroneously states that the trial court "determined" that the stricken allegations were "impertinent and scandalous"; and (2) concludes, without any citation to authority, that post hoc appellate procedures afford the Diocese no adequate remedy because publication of the stricken allegations could affect the Diocese's right to a fair trial. In fact, while the trial court's written order notes that the stricken allegations would be "impertinent and scandalous *if untrue* " (emphasis added), the trial court recognized that it had no basis to determine the veracity of those allegations [10] and thus the trial court's order identifies only the allegations' alleged immateriality as a basis for its ruling. In addition, the majority's conclusion—which, contrary to all authority on the question, appears to treat the pretrial publicity claim as a fait accompli—ignores both: (1) the fact that there is no evidence in this record to support the notion that publication of the stricken allegations would prejudice the Diocese's right to a fair trial in a manner that could not be remedied through extensive voir dire,[11] a change of venue, or other means;[12] and (2) the intersection of its Part VII conclu-

sion that subsequent actions by the Courier–Journal have "diminished the force of the argument in favor of sealing the material" [13] and its Part II conclusion that a "real possibility" exists that access would impair the Diocese's right to a fair trial. More significantly, however, we find no authority that supports the majority's suggestion that appellate procedures are inadequate to address due process concerns involving pretrial publicity. To the contrary, we believe the majority has overlooked *Bentley v. Moore,*[14] in which our predecessor held that a criminal defendant seeking extraordinary relief to prohibit a trial court from trying him in a jurisdiction where the defendant maintained he could not receive a fair trial had an adequate remedy through appeal and thus was not entitled to a writ.[15] As such, we see no basis for the majority's conclusion that traditional appellate procedures are inadequate, and that reason, standing alone, supports the denial of extraordinary relief.

However, the inappropriateness of extraordinary relief is further demonstrated by the lengths to which the majority goes to justify extraordinary relief despite the Diocese's complete failure to demonstrate that a great and irreparable injury will

---

**10.** The transcript of the trial court's hearing on the Diocese's motion to strike further supports our interpretation of the trial court's order:

Judge Noble: I'm going to direct Mr. Treadway to—

Mr. Famularo: To file a second—that names the plaintiffs, that strikes the scandalous and strikes the damages in punitive?

Mr. Treadway: She didn't say it was scandalous just immaterial.

Judge Noble: No, I didn't say that, I just said it was immaterial. I'm not going to make the judgment one way or another about the quality of it.

**11.** *See Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 15, 106 S.Ct. 2735, 2743, 92 L.Ed.2d 1, 14 (1986) ("[T]his risk of prejudice does not automatically justify refusing public

access .... Through voir dire, cumbersome as it is in some instances, a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict.").

**12.** *See infra* note 27 and surrounding text.

**13.** Majority Opinion, *supra* note 1 at 734.

**14.** Ky., 239 S.W.2d 237 (1951).

**15.** *Id.* at 238. *See also Fish v. Benton,* 138 Ky. 644, 128 S.W. 1067 (1910) *and Manning v. Baxter,* 281 Ky. 659, 136 S.W.2d 1074 (1940) (both holding that a writ will not issue to *prohibit* a change of venue in a criminal case where there is an adequate remedy by appeal).

result if relief is not granted. In fact, the majority admits that the Diocese cannot demonstrate irreparable injury, and instead argues that, because this case involves "important issues concerning the inherent authority of the trial courts of the Commonwealth," [16] the Court is free to consider the merits of the petition under *Bender v. Eaton's* [17] exception to the normal requirements for writs. That exception, however, requires the Court to conclude *both* "a substantial miscarriage of justice will result if the lower court is proceeding erroneously, *and* correction of the error is necessary and appropriate in the interest of orderly judicial administration." [18] Although the majority quotes this exact language—and observes that *Bender* itself emphasized the conjunction between the two conditions—the majority only addresses the second condition, and gives no indication of what "substantial miscarriage of justice" it believes will result in this case if relief is not granted. It thus appears that, in order to justify reaching the merits of this action, the majority has applied a new, and less-stringent, exception to the "irreparable injury" requirement than the one set forth in *Bender v. Eaton,* and in so doing, has, in effect, deleted the "irreparable injury" requirement entirely.

The "no adequate remedy by appeal" and "great and irreparable injury" procedural requirements serve an important function—they reserve extraordinary relief for extraordinary cases. [19] As the Diocese has failed to meet either requirement for the relief it seeks, the Court of Appeals properly denied the Diocese's petition. Accordingly, we would affirm the Court of Appeals on this basis without reaching the merits of the action. Because the majority reaches a different conclusion as to the Diocese's entitlement to a writ of mandamus, however, we will briefly outline our views regarding the relief granted by the majority.

## B. TRIAL COURT DISCRETION

We disagree with the majority's decision to remand this matter to the trial court for it to exercise its discretion and determine whether or not to seal the stricken allegations. The majority devotes a good deal of attention, in our opinion needlessly, to the nature of the right of access to court records and the process by which trial courts should weigh competing claims in the exercise of their discretionary control over records. While this analysis would be relevant if the matter before the Court involved a properly-presented allegation that the trial court should seal the record because of privacy interests, [20] the Diocese's argument to the trial court rested exclusively upon concerns over its ability to receive a fair trial. And, regardless of the source of the right of access to court records, no one disputes the fact that this right is not absolute. [21] In fact, when the news media's right of access irreconcilably conflicts with and jeopardizes a litigant's right to a fair trial, we would go further than the majority and hold that no balancing is necessary because the right to a fair

**16.** Majority Opinion, *supra* note 1 at 729.

**17.** Ky., 343 S.W.2d 799 (1961).

**18.** *Id.* at 801 (emphasis in original).

**19.** *Garrard Co. Bd. Of Education v. Jackson,* Ky., 12 S.W.3d 686, 689 (2000).

**20.** *Courier–Journal and Louisville Times Co. v. Peers,* Ky., 747 S.W.2d 125, 130 (1988).

**21.** *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570, 580 (1978).

trial trumps the right to access.[22] The only relevant question in our minds is whether a right of access to particular material *actually* conflicts with the right to a fair trial, and in making this determination, rights of access enjoy a presumption in their favor.[23] While we would take issue with the majority opinion's suggestion that trial courts should engage in a patently-outcome-determinative balancing analysis that allows the trial court to determine the "worth" of the right of access to particular material before placing it on the scale next to competing concerns, we need not do so here. Under the facts of this case, the size or importance of the presumption in favor of access is irrelevant because the Diocese introduced no evidence to support its prejudice claim, and conjecture alone cannot overcome any presumption in favor of access,[24] regardless of how the majority wishes the trial court to conceptualize it.

In order to overcome the presumption in favor of access to court records, the party opposing access must demonstrate by substantial evidence, and the trial court must determine, "that there is a substantial probability that the right ... to a fair trial ... will be otherwise irreparably damaged."[25] Such a determination requires specific, on-the-record findings,[26] that, much like the decision to issue a "gag order," should follow careful consideration of alternative means of protecting a litigant's right to a fair trial:

> The court should consider, among other factors, the nature and extent of the publicity, including whether the information would be available at trial, [and] whether the evidence is already generally known to the public ....

> If the trial court determines that there is a reasonable likelihood of material prejudice, it should consider prophylactic measures .... Less restrictive measures include: (1) extensive voir dire; (2) continuance of the trial; (3) sequestration of the jury; (4) change of venue; and (5) explicit jury instructions and admonitions. Each of these alternatives must be considered prior to rejecting them as inadequate.[27]

Here, the Diocese had the burden of proving that its right to a fair trial would

---

**22.** *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 248 (7th Cir.1975) ("[W]hen irreconcilable conflicts do arise, the right to a fair trial ..., must take precedence ...."), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976).

**23.** *Nixon v. Warner Communications, Inc., supra* note 21 at 435 U.S. at 602, 98 S.Ct. at 1314, 55 L.Ed.2d at 582 ("Also on respondent's side is the presumption—however gauged—in favor of public access to judicial records.").

**24.** *See Press–Enterprise Co. v. Superior Court, supra* note 11 at 478 U.S. at 15, 106 S.Ct. at 2743, 92 L.Ed.2d at 14 ("The ... right of access cannot be overcome by the *conclusory assertion* that publicity might deprive the defendant of that right." (emphasis added)); *United States v. Edwards,* 672 F.2d 1289, 1294 (7th Cir.1982) ("Where there is a clash between the common law right of access and a defendant's constitutional right to a fair trial, a court may deny access, but only on the basis of articulable facts known to the court, *not on the basis of unsupported hypothesis or conjecture.*" (emphasis added)).

**25.** *Ashland Pub. Co. v. Asbury,* Ky.App., 612 S.W.2d 749, 753 (1980).

**26.** *In Re New York Times Co.,* 828 F.2d 110, 116 (2nd Cir.1987) ("[D]ocuments may be sealed if 'specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.... Broad and general findings by the trial court, however, are not sufficient to justify closure." (citations and internal quotations omitted)).

**27.** *James v. Hines,* Ky.App., 63 S.W.3d 602, 607 (1998) (citations omitted).

be irreparably damaged if the trial court permitted access to the stricken allegations. Quite simply, the Diocese failed to meet its burden. In fact, the Diocese did nothing more than "cry wolf" and certainly made no effort to compare the relative efficacy of alternative measures of preserving its right to a fair trial. As a result, the trial court appropriately declined to find that access to these documents would impair the Diocese's right to a fair trial. Accordingly, as was the case in *Nixon v. Warner Communications, Inc.*, there is no need to remand this case to the trial court.[28] The Diocese articulated only one basis for sealing the record—an alleged risk of impairment to its right to a fair trial—and that reason is unsupported by the record. Thus, regardless of whether the trial court recognized its discretion, the trial court had no basis to seal the record. While the majority faults the Court of Appeals for basing its denial of relief on the fact that Judge Noble would have had to abuse her discretion to seal this record, we find this reasoning not only incontrovertible, but also a strong basis for denying extraordinary relief in this case. Unlike the majority, we see no reason to afford the Diocese another bite at an apple that it failed to even nibble upon at its previous opportunity.

## III. CONCLUSION

For the above reasons, we would affirm the decision of the Court of Appeals.

---

**28.** *Nixon v. Warner Communications, Inc., supra* note 21 at 435 U.S. at 611 n. 20, 98 S.Ct. at 1319, n. 20, 55 L.Ed.2d at 588 n. 20 ("The task of balancing the various elements we have identified as part of the common-law right of access to judicial records should have been undertaken by the courts below in the first instance. We need not remand for that purpose, however, because the outcome is readily apparent from what has been said above." citing *Bigelow v. Virginia*, 421 U.S. 809, 826–27, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975)).